### In re SCHENKEIN et al.

(District Court, W. D. New York. February 3, 1902.)

### No. 763.

1. INVOLUNTARY BANKRUPTCY—PRELIMINARY OBJECTION TO JURISDICTION—PARTNERSHIP.

In involuntary bankruptcy, an objection that petitioner and the alleged bankrupts are partners is not determinable on a preliminary objection to the jurisdiction, where the arrangement between the parties is one going to the merits of the controversy.

2. SAME—SOLVENCY—BURDEN OF PROOF.

Where the act of bankruptcy charged is removal and concealment, the burden of pleading and proving solvency is on the bankrupts.

3. SAME—ATTACHING CREDITOR—RIGHT TO PETITION.

A creditor of an alleged bankrupt, who obtains an attachment, has, in substance and effect, a lien on the property until the attachment is vacated or becomes null and void by the adjudication, and to such extent, and up to that period, must be deemed to have a preference, and therefore not a provable debt, and, the attachment not being surrendered, has no standing to maintain a petition in involuntary bankruptcy.

4. SAME—TIME OF TAKING OBJECTION.

The objection that an attaching creditor has no standing to maintain a petition in involuntary bankruptcy may be taken by the alleged bankrupts preliminarily, to prevent their examination, where they are in the custody of the court pursuant to a warrant of arrest issued under Bankr. Act, § 9b, which provides that the judge, under certain circumstances, may keep the bankrupt in custody until he shall be examined, or give bail for his appearance for examination.

In Bankruptcy. The following is the opinion of the special master:

This is an examination of alleged bankrupts under section 9b, Bankr. Act, referred to the undersigned, as special master, by an order of the district court dated November 16, 1901, with leave to the alleged bankrupts "to set up, assert, and present such preliminary objections to the sufficiency of the papers herein, to the regularity of these proceedings, and to the juris-

diction, as though the same were personally presented" to the court. There seems to be little, if any, dispute on the facts, which may be stated as follows: On November 7, 1901, Emmett W. McConnell filed a petition in involuntary bankruptcy against Samuel Schenkein and Martin A. Coney, alleging, among other things, that the latter were "copartners and persons united in interest in the management and care of an institution known and described as the 'Infant Incubators' at the Pan-American Exposition, Buffalo, N. Y., and that your petitioner is a creditor of the said Schenkein & Coney, and your petitioner has an approvable claim against them, amounting, in the aggregate, in excess of securities held by him, to the sum of five hundred dollars." The petition also alleges that under the agreement between the petitioner and the alleged bankrupts, whereby, for certain considerations, he was to receive twenty-five per cent. of the gross receipts of the concession known as the "Infant Incubators," there "became and was due and owing your petitioner * * * the sum of thirty-one thousand two hundred and fifty dollars, no part of which has been paid, except the sum of fourteen thousand dollars, leaving a balance yet due and owing your petitioner of seventeen thousand two hundred and fifty dollars, with interest from November 1, 1901." The petition also alleges that the petitioner had previously begun an action in the supreme court of the state of New York on such indebtedness, and in such action obtained an attachment against "the property, building, paraphernalia, and appliances used by said Schenkein & Coney in the display at the Pan-American Exposition aforesaid," and that under such attachment the sheriff of Erie county has attached and taken possession of the same, and between fifty and sixty dollars in cash found on the premises, and about forty dollars on deposit in a local bank. The petition also shows that in such action an order of arrest was granted, and the debtors taken into the custody of the sheriff of Erie county, who at that time still had custody of them, but from whose custody, it appeared on the argument, they have since been released. The petition alleges as the act of bankruptcy committed by the alleged bankrupts that they have, "for the purpose of hindering, delaying, and preventing the collection of your petitioner's claim, and the claims of their other creditors, if any, and to defraud, wrong, and cheat and swindle your petitioner and their other creditors, if any, * * * concealed, assigned, transferred, and disposed of all moneys collected in said infant incubators by the exhibition thereof, and not remaining in their hands, in the sum of twenty-nine thousand dollars." On this petition, and on the affidavits of the petitioner, Emmett W. McConnell, and his attorney, Percival M. White, filed at the same time, the district court, on the 7th day of November, 1901, issued a warrant, directed to the marshal of the district, whereby he was required to bring the alleged bankrupts "before the court forthwith for examination, and thereafter and thereupon to hold such bankrupts * * * as this court may direct"; such warrant reciting the commission of an act of bankruptcy, and that the alleged bankrupts "are about to sell, assign, transfer, their property for the purpose of hindering and defrauding their creditors, and that they, and each of them, are about to leave this district * * * to avoid examination, and that their departure, or the departure of either of them, will defeat these proceedings in bankruptcy." The marshal thereupon took the alleged bankrupts into custody, and brought them into court for examination, whereupon the order of reference previously mentioned was made. Other facts will appear from the discussion of the questions raised by the respective parties.

The alleged bankrupts have appeared by counsel, and raised three preliminary objections to this examination, all of them going to the jurisdiction. For the purpose of this examination, they seem to have waived any technical objections to the papers themselves,—as, for instance, the use of the word "approvable," instead of "provable," in the petition,—so that the questions to be determined are three: (1) Whether the petitioning creditor and the alleged bankrupts were partners. (2) Whether, because of the unsurrendered attachment, the petitioner has a petitioning creditor's debt at all. (3) Whether the petition itself does not show the alleged bankrupts to be solvent.

**1.** It is conceded by the respective attorneys that, if the agreement between McConnell and Schenkein and Coney amounts to a partnership, under Ex parte Richardson and In re Palmer, 3 Deac. & C. 244, Ex parte Briggs and In re Notley, 3 Deac. & C. 367, and Ex parte Gray, 4 Deac. & C. 779, the petitioner here has not a petitioning creditor's debt, and this plea to the jurisdiction will be fatal, not merely to this branch of the proceeding, but to the proceeding itself. It seems strange that this question has never been up in the United States: Robinson v. Hanway, Fed. Cas. No. 11,953, being in point only by analogy. There can. however, be no doubt that the principles laid down in the English cases cited express the law. Was, then, the arrangement between McConnell and Schenkein and Coney a partnership? By stipulation, the original agreement, bearing date April 10, 1900, and signed by the three individuals, has been made a part of the papers on this proposed examination, and a construction of it is necessary to determine the rights of the parties. Without quoting from such agreement in detail, it may be sufficient to summarize as follows: The counsel for the petitioning creditor claims that this agreement does not constitute the parties partners, for the following reasons: The words "partner" and "partnership" do not occur therein; Schenkein and Coney are together parties of the first part, and McConnell alone party of the second part. McConnell agrees to lend not more than $15,000 to Schenkein,—he being the official concessionaire,—and not to the two. McConnell is given title to the plant until he is repaid such loan. Schenkein and Coney, and not McConnell, have title to the plant after such loan is paid. Nothing on the face of the agreement indicates the rate of division, either as to profits or losses, between Schenkein and Coney. Nothing on the face of the agreement amounts to a covenant to share losses. Nothing on the face of the agreement amounts to a covenant to share net profits. Nothing on the face of the agreement amounts to a covenant on McConnell's part to devote his time or services. Nothing on the face of the agreement indicates that there was any consideration for the agreement, save the advance of money. Creditors other than McConnell are not affected; he being, as is alleged, the only creditor. The counsel for the alleged bankrupts claims that this agreement covers a period of three years, and prevents all three parties from engaging in any other similar business during that period; it appearing to have been the original plan to conduct the same exhibit not merely in Buffalo, but at the then proposed expositions at Toledo, Ohio, and St. Louis, Mo.; that the petitioning creditor has a proprietary interest in certain of the avails of the business, under the clause which is as follows: "It is understood and agreed by the parties hereto that should the parties of the first part, or either of them, prepare any lotions, foods, powders, or other preparations, or should any of the parties hereto adopt any lotion, food, or other preparation, to be used in the care and using of infants, and shall have the same protected by trademarks, copyrights, or patents, the party of the second part shall have an undivided one-fourth interest in said trade-marks, copyrights, or patents;" that the interest of none of the three could be disposed of without the consent of the others; that in one of the recitals of the agreement it is stated that McConnell "desires to take an interest in said concession of infant incubators"; that McConnell has the right to appoint a representative or cashier; that the gross receipts were to be divided daily in the presence of all the parties. In brief, the agreement would seem to indicate that the concessionaire, Schenkein, who had associated with him the alleged bankrupt, Coney, needed money; that McConnell was willing to furnish the money to install the plant, provided he had title to the same until he could be repaid his advancement, he to take one-half of the gross receipts until such repayment was accomplished, and then to receive one-fourth of the gross receipts thereafter, the title to the plant to vest instantly in Schenkein and Coney, and McConnell to have no interest in the business save his 25 per cent., other than the one-fourth proprietary interest in the lotions, foods, powders, and other preparations which should be used in the plant, and then only after the same had been protected by trade-marks, copyrights, or patents. I am frank to say that my first impression of this arrangement, which was based upon the petition and affidavits, was that it was a part-

nership. The submission of the original agreement, however, has led to the opposite conclusion. The law of the state of New York, which is, of course, controlling on this proposition,—this being a New York contract, and carried out in that state,—while not entirely clear, seems to be summed up in the following, from Richardson v. Hughitt, 76 N. Y. 55, 32 Am. Rep. 267: "The general rule, no doubt, is that, to constitute a partnership, there must be a community of interest inter sese, and that the parties shall share the profits and loss. 3 Kent. Comm. 23; Pattison v. Blanchard, 5 N. Y. 186. This, however, is not without exception, and, where there is an agreement for sharing in the profits of a business, in some cases it is sufficient to establish a partnership as to third persons. See Manufacturing Co. v. Sears, 45 N. Y. 797, 6 Am. Rep. 177. And here comes in another exception to the rule last stated, which is that where the person has no interest in the capital or business, and is to be remunerated for his services by a compensation from the profits, or measured by the profits, or what is to depend, as in case of seamen or other voyages, upon the result, it has no application. Where, then, one is only interested in the profits of a business as a means of compensation for services rendered, he is not a partner. Leggett v. Hyde, 58 N. Y. 272, 280, 17 Am. Rep. 244; Smith v. Bodine, 74 N. Y. 30; Vanderburgh v. Hull, 20 Wend. 70; Burckle v. Eckart, 1 Denio, 337, on appeal 3 N. Y. 132; Fitch v. Hall, 25 Barb. 13; Lamb v. Grover, 47 Barb. 317; 1 Smith, Lead. Cas. (5th Am. Ed.) 292. These cases fully sustain the doctrine laid down, that, where the profits are a measure of compensation, no partnership is created." Compare, also, Curry v. Fowler, 87 N. Y. 33, 41 Am. Rep. 343; Cassidy v. Hall, 97 N. Y. 159. The rule laid down in Richardson v. Hughitt, supra, has been distinguished by the same court in such cases as Hackett v. Stanley, 115 N. Y. 625, 22 N. E. 745; Magovern v. Robertson, 116 N. Y. 61, 22 N. E. 398, 5 L. R. A. 589; Bank v. Gallaudet, 122 N. Y. 655, 25 N. E. 909,—cited by the counsel for the alleged bankrupts. But a careful reading of these cases will discover points which make them clearly distinguishable from the case at bar. In Hackett v. Stanley the agreement was "to divide equally the net profits of the business," and recited that the arrangement was not merely in consideration of the loan, but "in further consideration of services of the said party of the second part in securing sales in said business, and for any further moneys he may, at his own option, advance for use in said business." In Magovern v. Robertson the parties seeking to avoid partnership liability were by the agreement given one-third of the net profits "in consideration of their indorsement and their general interest in the business." In Bank v. Gallaudet the parties were to share equally in the profits after the partner who made the advances had been repaid. In other words, there was a sharing in the net profits. In all of these cases, too, the question arose between outside creditors and the alleged partners,—a very different proposition, on the equities, at least, from that at bar, where the question is between three persons who were parties to a written agreement fixing their rights. It is undoubtedly true, as urged by the counsel for the alleged bankrupts, that the giving of a proprietary interest in the lotions, etc., to McConnell, is strong evidence of a partnership. Magovern v. Robertson, supra. But I cannot agree with him that this element of the agreement alone should negative the numerous elements the other way,—certainly not on a preliminary objection of this kind; for I take it that this point will be brought to the attention of the court when the merits of this controversy are to be determined; that is, after the alleged bankrupts shall have filed their answer to this petition. The objection to the jurisdiction on the ground that McConnell is a partner of the alleged bankrupts, and therefore has not a petitioning creditor's debt, is overruled.

2. But has this creditor, who comes into court alleging his attachment, and not offering to surrender it, a petitioning creditor's debt? Manifestly if an attachment is a preference, he has not such a debt. In re Rogers Milling Co. (D. C.) 102 Fed. 687; In re Gillette, 5 Am. Bankr. R. 119, 104 Fed. 769. And Judge Seaman, in Re Burlington Malting Co., 6 Am. Bankr. R. 369, 109 Fed. 777, has held (the facts being strikingly similar to those here) that an attachment is a preference. That case, however, rests on the

doctrine of equivalency between the two terms,—a doctrine with which, though with great respect, I cannot agree. The learned judge overlooks the very kernel of Pirie v. Trust Co., 182 U. S. 438, 21 Sup. Ct. 906, 46 L. Ed. ——,—that without which it is as sounding brass,—namely, its ruling that section 60a defines a "preference." Thus: "Subdivisions 'a' and 'b' are concerned with a preference given by the debtor to his creditor. Subdivision 'a' defines what shall constitute it, and subdivision 'b' states a consequence of it,—gives a remedy against it. The former defines it to be a transfer of property which will enable him to whom the transfer is made to obtain a greater percentage of his debt than other creditors. The latter provides a consequence to be that the transfer may be avoided by the trustee, and the property or its value recovered, provided, however, that the preference was given within four months before the filing of the petition in bankruptcy, or before the adjudication, and the creditor had reason to believe a preference was intended. So far, so clear." Now, an attachment is neither a "judgment" nor a "transfer." It cannot, therefore, be a "preference." It need not be surrendered under section 57g. Unless there is other objection to it, it may coexist with a petitioning creditor's debt. Looked at from the broader ground of the p licy of the law, the question is close,—so close that, were it urged on the merits, and not preliminarily to prevent an examination to which this petitioning creditor has some right, the decision here might be the other way. An attaching creditor, under the law of 1867, seems to have been admitted or excluded from the bankruptcy courts somewhat at will. Thus such creditors could intervene and object to an adjudication. In re Bergeron, Fed. Cas. No. 1,342; In re Mendelsohn, Fed. Cas. No. 9,420; In re Hatje, Fed. Cas. No. 6,215. Yet such creditors could not be counted when the question was whether an involuntary petition represented the required proportions in number and amount. In re Scrafford, Fed. Cas. No. 12,556, reversing same case below, Fed. Cas. No. 12,557. The reason for the distinction seems to be that in the former cases their attachments would be avoided by the bankruptcy; in the latter, their claims, if counted, might put the nonattaching creditors at the mercy of those who had attached. Under the law of 1867, no secured creditor could petition In re Frost, Fed. Cas. No. 5,134; In re Green Pond R. Co., Fed. Cas. No. 5,786. Contra, In re Stansell, Fed. Cas. No. 13,293. Compare, also, In re Rado, Fed. Cas. No. 11,522; In re Currier, Fed. Cas. No 3,492. This doctrine forced Judge Dyer, of Wisconsin, to hold in Re Broich, Fed. Cas. No 1,921, that an attaching creditor is not a secured creditor, and has, therefore, a petitioning creditor's debt. It is not necessary here to determine whether, under the present law, an attaching creditor is, strictly speaking, a "secured creditor." If unsecured, he surely has standing here. If secured, under the present law (§ 59b), this objection being in the nature of a demurrer, his allegation, which is, in substance, that the attachment is a security worth at least $500 less than his claim, is sufficient. The only case directly in point under the law of 1867 is In re Hazens, Fed. Cas. No. 6,235, decided by Judge Dillon after his decision in Re Scrafford, supra. He takes broad ground, seeming to admit that an attachment is a security, and, while decreeing that a creditor who is fully secured by attachment cannot, while holding on to his attachment, sustain on the same debt a petition to force his debtor into bankruptcy, adds: "If, however, a creditor is not fully secured, it is, I think, quite probable that, as to the excess of his debt over the value of the security, he is to be regarded as unsecured." Thus clearly implying that the case is authority only where the attachment lien equals the debt. This broad view has now become a part of our statute (Bankr. Act. §§ 59b, 57e). In a close question like this, it is safer to follow it, than would be the opposite course. I am not unmindful of the great force of Judge Seaman's remarks in Re Burlington Malting Co., supra, holding that an attaching creditor has elected his remedy. But it has been held that a lien creditor waives his lien by the mere fact of filing a petition. In re Bloss, Fed. Cas. No. 1,562. Under section 67f, this creditor would undoubtedly be admitted to prove his claim only on condition that his attachment lien be considered null and void. He does not give up his lien in so many words, but his petition is the first

of a series of acts which make that surrender inevitable. There may be some cases—and this is apparently one—where the attachment did not reach the property at which it was aimed. If this creditor has a debt in $17.250, as he alleges, the security is palpably insufficient. The attachment and the petition were but a few days apart. The claims of other creditors are not involved, for there are no other creditors. It would be unjust, at least at this stage of these proceedings, to hold no jurisdiction on these grounds. This objection is, therefore, for the purposes of this examination, overruled.

3. Nor is it important whether this petition show insolvency. The act of bankruptcy alleged is the first. Section 3a (1). The quantum of this estate is kept under cover. Citizens' Bank of Salem v. W. C. De Pauw Co., 5 Am. Bankr. R. 345, 45 C. C. A. 130, 105 Fed. 926. There is a conceal-ment here, which, if the facts alleged in the petition and affidavits are true, is with intent, at least, to hinder and delay this creditor. By section 3c the burden of pleading and proving solvency is on the alleged bankrupts. Compare West Co. v. Lea, 174 U. S. 590, 597, 19 Sup. Ct. 836, 43 L. Ed. 1098. They cannot be allowed at this time to object to jurisdiction on this ground.

The preliminary objections are therefore overruled, and the examination will proceed at 11:30 a. m. on January 13, 1902, unless on or before January 10, 1902, the alleged bankrupts shall file a petition for review, which will in that event be granted.                    William H. Hotchkiss, Special Master.

Percival M. White (Philip V. Fennelly, of counsel), for petitioning creditor.

Irving L. Fisk (Louis L. Babcock, of counsel), for alleged bank-rupts.

HAZEL, District Judge. On November 7, 1901, a petition was filed by a creditor to adjudge Samuel Schenkein and Martin A. Coney, copartners, bankrupts. At the same time an application was made by the petitioner for a warrant to the marshal, directing him to bring the alleged bankrupts forthwith before the court for examina-tion, as provided for by section 9b of the bankruptcy act. In obedi-ence to the warrant the alleged bankrupts were brought into court by the marshal, and, by counsel, objected to the jurisdiction of the court on the grounds (1) that petitioner and the alleged bankrupts were partners; (2) that petitioner had obtained a preference in the state court in the nature of an attachment upon property of the alleged bankrupts, and, therefore, the attachment not being surren-dered, the petitioning creditor has no provable debt; (3) that the petition to have debtors adjudged bankrupts does not disclose insol-vency. The future appearance for examination of the alleged bank-rupts whenever required having been satisfactorily arranged by coun-sel for petitioner and for debtors, an order of reference was made to Referee Hotchkiss, as special master, to decide and determine the objections to the jurisdiction of the court, and to continue the exam-ination of the bankrupts if such objections were found untenable. The alleged bankrupts are therefore in the custody of the court pur-suant to the warrant of arrest. The special master, after due deliber-ation, overruled all the objections urged to the jurisdiction. His reasons therefor are submitted in an opinion, wherein he exhaustively reviews the authorities under the bankruptcy act of 1867, bearing on the proposition presented, and disagrees with the holding of In re Burlington Malting Co., 6 Am. Bankr. R. 369, 109 Fed. 777, under the present act. The opinion accompanies the allowance of a peti-

tion for review of his ruling upon the three preliminary objections raised by respondents. I concur with the special master in his decision, for the reasons stated in his opinion, upon the first and third of these questions. The special master found that the agreement entered into between the petitioner herein and the partnership proceeded against was not a copartnership; that, while there was evidence of a copartnership based on agreements between the parties, yet such evidence, standing alone, was not sufficient to negative contrary elements on a preliminary objection to the jurisdiction. The arrangement between the parties was very properly held to be a subject going to the merits of the controversy, and therefore not determinable at this time. The special master, however, found that, inasmuch as the act of bankruptcy charged was removal and concealment, the burden of pleading and proving solvency is on the bankrupts. This finding is also approved.

I am unable to approve the finding and conclusion on the second question certified for review. I am of opinion that a creditor who obtains an attachment has, in substance and effect, a lien upon the property covered thereby, until such attachment is vacated or becomes null and void by the adjudication. To this extent, and up to that period, the attaching creditor must be deemed to have a preference such as would give him a greater percentage of his debt than any other creditor not similarly secured or protected in his claim. Here we have a petitioner who has applied for, and obtained from the state court, a provisional remedy, which, if allowed to prevail, secures his indebtedness, or a part of it, to the exclusion of other creditors. A lien is created upon property of the alleged bankrupts to the detriment and hindrance of general creditors. The claim of the petitioner through legal proceedings is permitted to become a lien on the property attached. He holds an attachment on the property of the alleged bankrupts in one hand, and comes into this forum in the present case, seeking another provisional remedy, while maintaining his attachment as an anchor to windward in case of an adverse ruling. One remedy availed of inures to the petitioner's sole benefit. It may be quite true that a lien on property attached in a state court cannot strictly be construed as a transfer of property, within the contemplation of section 60 of the act, whereby a preferential transfer is created. Pirie v. Trust Co., 182 U. S. 438, 21 Sup. Ct. 906, 46 L. Ed. ——. Section 67, however, specifically provides that a lien created by attachment upon mesne process, begun within four months of filing the petition, shall be dissolved by the adjudication whenever "it appears that said lien was obtained and permitted while the defendant was insolvent and that its existence and enforcement will work a preference." This section, construed with the other provisions of the bankrupt act bearing on the rights of an attaching creditor, and the provableness of his claim without formal release of any preference obtained, is strongly persuasive of the soundness of Judge Seaman's decision in Re Burlington Malting Co., supra, where the contention was similar to that presented here. It was there held that an attachment was a preference, within the meaning of the bankrupt act; that it was a lien sought and permitted in fraud of the pro-

visions of section 67c. The claim thus secured to the creditor by attachment was held not to be provable unless the preference created thereby was surrendered, as required by section 57g. The spirit of the Pirie Case would seem to strengthen the position of Judge Seaman, rather than that of the referee, when all the applicable sections of the law are considered together. The opinion of Judge Seaman further points out that the failure by congress to recognize an attachment lien as belonging to that class of securities made valid and unaffected by an adjudication in bankruptcy gives force to his interpretation and conclusions. I concur in this view. The lien of an attachment, undoubtedly, by operation of law, creates a preference which enables the attaching creditor to obtain a superior right to the property levied upon. The referee views the proposition somewhat doubtfully. After stating that an attachment is neither a "judgment" nor a "transfer," and cannot, therefore, be a "preference," and that "it may coexist with a petitioning creditor's debt," he says:

"Looked at from the broader ground of the policy of the law, the question is close,—so close that, were it urged on the merits, and not preliminarily to prevent an examination to which this petitioning creditor has some right, the decision here might be the other way."

I am unable to take this view of the contention. The objection to the jurisdiction was made in due time to prevent an examination of the debtors, to which the petitioning creditor, under certain conditions, is entitled. By section 9, under which the petitioning creditor proceeds, it is provided that a bankrupt, under certain circumstances, shall be exempt from arrest upon civil process. Under certain circumstances, the judge may order the marshal to keep the bankrupt in custody not exceeding 10 days, but not imprison him, until he shall be examined and released, or give bail for his appearance for examination from time to time, not exceeding, in all, 10 days. On an application of this character, it must clearly appear upon satisfactory proof, by the affidavits of at least two persons, that the bankrupt is about to leave the district for the purpose of avoiding examination. Under section 2, subd. 15, it was held that the court may issue an order in the nature of a writ of ne exeat. In re Lipke (D. C.) 98 Fed. 970. The drastic remedy provided by section 9 is one directed against the liberty of a citizen, and therefore should be strictly construed and carefully applied. Manifestly, the rights of the petitioning creditor and the rights of the alleged bankrupts under this particular section must be determined at the very threshold of the proceeding. The language of Judge Seaman in the Burlington Malting Co. Case, supra, in reference to the dual position of a petitioner in involuntary bankruptcy, who also pursues a remedy to maintain an invalid lien against the same person in another forum, aptly applies. He says:

"Instead of the single proceeding on the part and for the benefit of the general creditors intended by this act, to save the assets of an insolvent debtor from spoliation by preferences, and secure equality in their distribution, this petitioner appears, with a claim disputed and fairly disputable, seeking, on the one hand, to obtain a preference by enforcing it through an attachment against the property, and, on the other, invoking the inconsistent remedies of bankruptcy."

In no sense can it be urged as a justification for the continuance of the attachment that the bankrupt act does not afford complete machinery for the conservation of the bankrupt's estate. Simultaneously with the filing of the petition, the property of the alleged bankrupts might have been taken into the custody of this court. The petitioner did not adopt this course. He rests on his attachment, and must therefore be denied the equitable relief he now seeks of this court.

The ruling of the referee on the second question submitted for review is reversed, and the order of arrest is vacated.